May it please the Court. My name is Michael Desmond, and I represent the appellants in this case. With me here in the courtroom and also on brief is Saul Mezzi. If I may, I'd like to reserve three minutes of my time for rebuttal. Although this case arises under a complex set of procedural tax rules, it's not a complex tax case. It's a contract case. It's a contract case that involves a tolling period of limitations agreement. The question presented here is relatively straightforward. If the IRS wants time, additional time, to complete its audit of a partnership, must it name that partnership in the tolling agreement it obtains? The answer to that question is also relatively straightforward. It must. Back in 2004, when the IRS started its audit of the transaction at issue in this case, it knew that there were two separate entities involved in the transaction, the first chip partnership and the 2000-A partnership. Accordingly and logically, and not knowing at that time what theories it might pursue or against which entity it might pursue those theories, it pursued and requested two separate tolling agreements. It asked for the Form 872i tolling agreements from the partners in first chip, and it secured those tolling agreements. It also requested in March of 2004 a tolling agreement from the separate entity, from the 2000-A partnership. It never got that tolling agreement, didn't pursue that tolling agreement, doesn't have a tolling agreement that covers the 2000-A partnership. The problem that now presents for the IRS is that more than four years later, when it completed its audit, it chose to pursue a theory only against the 2000-A partnership. It adjusted partnership items of the 2000-A partnership in an FPAW issued in 2008 only to the 2000-A partnership. At the time, it certainly could have pursued alternative theories against first chip, the entity that it had a tolling agreement for, but it didn't. So as we sit here today, there is a distinct mismatch between the tolling agreement it has, which covers first chip, and the FPAW adjustments that it made, which were only made with respect to partnership items of the 2000-A partnership. Simply put, what we have here is a disconnect between the tolling agreement and the adjustments that the IRS made. Roberts. So if we look at the language of the tolling agreement, what do you view as the flow-through items? Fisher. The language, partnership flow-through items of first chip, and I think the government recognizes this on brief, refers to partnership items of first chip. That is a statutorily and regulatorily defined term. Partnership items of first chip and adjustments to those items. So that would cover, as I said, any adjustments that it made by issuing an FPAW to first chip. And there are a number of theories that it could have pursued against first chip to do that, and had it done so, this contract would have clearly covered those theories, and we wouldn't be here. So it refers to the statutory term. Kagan. So the partnership flow-through item is coextensive with partnership item or not? Fisher. Partnership item of first chip, and only of first chip. Kagan. Doesn't that write out the phrase flow-through? Fisher. I don't think it does. Partnership items, by definition, do flow through. Kagan. Right. But that's a, you know, term. Obviously, partnership items, if you just said partnership items, are going to flow through to the individual partners. Fisher. Correct. Kagan. You don't need to say flow-through. Don't you think there's some implication there that we're talking about items that go back and forth between the upper-tier and lower-tier partnerships? Fisher. Well, and I think that's a fair implication with respect to first chip and its partners, the 14 trusts that signed the 872Is. It certainly does not apply to everything underneath first chip, which is the 2000-A partnership. And I think we But the government does make that argument, and Judge Hamilton below did accept a version of that argument in saying that since all of the adjustments here in the 2000-A FPAW sort of bounce off of the first chip partnership, and the government sort of rides that and says, well, since they're all sort of partnership items of first chip, why does it matter? And I think one illustration of that, and again, not to put too much emphasis on it, is that that's simply not true. The first chip partnership was a majority partner in 2000-A, but there's a significant portion of the adjustments at issue in this case which had nothing to do with first chip. They went up through the minority partners in 2000-A. And the government concedes that point on brief, that even under their argument, their tolling agreement doesn't cover everything that their FPAW did. And I think that just illustrates that that flow-through language that the Court is focusing on does not have special meaning that somehow sweeps in everything underneath first chip, and sweeps in the FPAW adjustments the virus has made in this case. So I come back and, again, reiterate the point that is the plain language point that the appellants are making here. If the government wants a contract to cover an entity, just like any other party entering into a tolling agreement, or a contract for that matter, the government needs to name that entity in its tolling agreement. Basic principle of contract law. Plain language, it didn't do it. Plain language, it loses the tolling agreement issue. As I said, Judge Hamilton, of course, picked up on that flow-through, and picked up on the government's argument, and looked at this unique issue of partnership items of first chip, and read a lot into that to hold against us in denying the motion for partial summary judgment below. There are several flaws, I think, in Judge Hamilton's analysis, and also in the court, some of which the government is making for the first time before this court. One is with respect to partnership items. So the government says, well, there's a loss on this return filed by first chip that is in and of itself a partnership item of first chip. And that is correct, but it's also very misleading, because that would only be relevant in this case if the IRS had issued an FPAW to first chip. Then, of course, the fact that you have a loss, it's a partnership item of first chip, is very relevant. If the IRS wants to adjust it, it needs to issue an FPAW to first chip. It could have done that. It thought about doing that in 2004, when it secured a tolling agreement for first chip. But in 2008, it issued an FPAW only to 2000-A, and didn't adjust that partnership item of first chip, that loss that the government's talking about on brief. So I think that's one flaw in the government's argument. The second major flaw in the government's argument is that for the first time on brief, the word adjustment in the tolling agreement means adjustment to the ultimate taxpayer's returns, the 14 trusts here. And that's made by the government on brief, and basically is made out of whole cloth. They simply say it must mean the ultimate taxpayer's returns, and then they proceed to analyze the entire case with that assumption having been assumed away, that language having been assumed away. And I point to several flaws in that argument, one being Judge Hamilton didn't accept it. She said adjustment means adjustment to partnership items. And they're now saying in their brief at footnote 12, well, no, no, no, Judge Hamilton was wrong on that. Also, it's completely inconsistent with the Tefra regime, and, indeed, inconsistent with the notice of final partnership administrative adjustment that is the jurisdictional basis for this case. Adjustment based on that document has to mean, and under the entire Tefra regime, means adjustment to partnership items. It has nothing to do with the 14 ultimate trusts here who weren't under audit in 2004, weren't under audit in 2008, and whose returns are not being adjusted in this case. The only thing being adjusted are partnership items of 2000-A in an FPA issued in 2000-A. The only tolling agreement that the government has here speaks to a completely different entity, the first ship partnership. So there's a complete disconnect, as I started off saying, between the tolling agreement, the contract the government has, and the audit adjustments that ultimately pursued. Could it have pursued other theories against first ship? Absolutely. Its own public notice in notice 2000-44 articulates theories that would have been relevant against first ship and would have been covered by the tolling agreements. In 2008, it did not pursue those theories. We're sitting here today with a tolling agreement covering one entity and adjustments and theories pursued against another entity. The one entity they pursued is not named in the contract. You need to go no further than the four corners of that contract to see that 2000-A is not mentioned in it, and the adjustments are not mentioned in it. And that, we submit, answers the case. So I'd be happy to answer any further questions the panel has. Otherwise, I'd like to reserve the balance of my time for rebuttal. Roberts. Thank you, counsel. Thank you. May it please the Court. Arthur Catterall of the Justice Department on behalf of the government. Let me first clarify that whether the word adjustment in this, in the restrictive language, refers to adjustments or the adjustment of first ship's claimed $300 million loss to zero, or instead refers to the resulting adjustment of each trust's share of that claimed loss to zero, is completely beside the point, has no bearing on the issue at hand. Well, you did emphasize it quite a bit in your brief. We, and basically, we, well. And below. We, I'm sorry? And below. And below, I said there. That was. Well, I mean, I think the reason that we dropped that footnote is because we do differ with the analysis that the lower court put forth. The lower court basically said the IRS wins if these adjustments in the 2000A FPAA are attributable to adjustments to first ship, which I, that doesn't seem to be a straightforward reading of the language. The reason it doesn't matter what the word adjustment refers to is because any adjustment at the trust level presupposes a prior adjustment at the first ship level. You can't have one without the other. So it doesn't matter what the word adjustment refers to. We were trying to clarify what we thought the, you know, the district court was trying to say and may have caused some confusion. But in order to try to alleviate any of that confusion, let's just, let's go ahead and assume, I'm happy to assume, that the word adjustment refers to adjustments to partnership flow-through items of first ship LLC. I'm happy to assume that. So you would agree that the extension agreement doesn't apply to the partnership items that flow through to the minority partners, correct? Correct. So if we take that, doesn't — it seems to be somewhat of a logical disconnect to say that it doesn't apply to the minority partners, but it would apply to first ship. No, because the agreement applies to adjustments to partnership flow-through items of first ship, not to partnership flow-through items of fourth ship or to adjustments that flowed through from LGMA. The trust — I mean, the language refers to partnership flow-through item — partnership adjustments to partnership flow-through items of first ship. And so that's why the adjustments that flow through the other two partners are not covered by the agreement. And let me just say again, the adjustments that flow through to the other two partners, you know, you look and you say, well, you know, a million dollars, that's a lot. You know, how could the IRS just, you know — Right. How could you let that go? Because you've got — Because the loss that we're after is the $320 million. We're talking about one-third of 1 percent of, you know, comparing $1 million to $320 million. Also — So you're saying it's still a sham as to the other two, but you didn't go for it. Well, let me just say this. The other two partners did not participate in the shelter, okay? So the losses that flowed through to them were not attributable to the shelter. They were attributable to ancillary transactions. Arguably, you know, those were economic losses, and the IRS couldn't disallow them anyway. But in any event, they're not covered by the agreement because the agreement was after the $320 million loss claimed by First Ship. So at least as to the minority partners, you would agree that the district court needs to be reversed on that? Correct. Yeah. Yeah. And so let's go back to the partnership items that's listed in the agreement, and then you go to partnership flow-through items that the attachment refers back to. There's some appeal in a contract argument that you've got colliding terms because partnership items are statutorily defined. So would you address this point in how they fit together? And I think we do agree that for purposes of this case, partnership flow-through items of First Ship simply means partnership items of First Ship that flow through to its partners. I can give you an example of a partnership item of First Ship that doesn't flow through to its partners. I mean, the things that flow through to the partners are income, loss, credit, deduction. Other partnership items, you know, liabilities, distributions, contributions to another partnership, those don't flow through to the partners of the partnership. So partnership flow-through items of First Ship LLC is a subset of partnership items of First Ship LLC. It's the partnership items of First Ship LLC, income, loss, deduction, credit, that flow through to its partners. And I think we pretty much are in agreement on that. I mean, the disagreement is they said, but you're stuck with First Ship and that they're not really First Ship. I'm sorry? They're just arguing that in effect, the language in those agreements is also modified by partnership flow-through items of First Ship, that they don't fit within that in terms of 2000A. Our point is that an adjustment to a partnership item of First Ship, I think we agree that this $300 million loss that First Ship claimed is a partnership item of First Ship that flowed through to its partners. The question is, is it any less of a partnership flow-through item of First Ship simply because it derives from an adjustment to a partnership item of a partnership in which First Ship held an interest? Right. But is not First Ship. I'm sorry? But is not First Ship. A different partnership that First Ship held an interest in. That's the 2000A partnership. And so, I mean, I think we agree that if this $300 million loss, if First Ship had claimed a $300 million loss on, say, a disposition of, you know, like a piece of I don't think there's any dispute that if that were the case, these consent agreements would extend the period for assessing any tax that might result from the disallowance of that claimed loss until June 30th, 2008. And so the question is, does the language of these consent agreements somehow cover that kind of loss, First Ship, First Ship flow-through partnership item of partnership flow-through item of First Ship, does it cover that kind of loss, but it doesn't cover a loss that First Ship claims on the liquidation of its interest in another partnership? That seems to be a disconnect to me. And, I mean, the only way you can read the language of the consent to produce that result is if the reference in the restrictive language to adjustments to partnership flow-through items of First Ship doesn't mean all partnership flow-through items of First Ship. It just means partnership items of First Ship. of First Ship or adjustments to partnership items of First Ship that were not triggered by adjustments to partnership items of some other partnership that First Ship held an interest in. And I under the plain language of the agreement, I mean, an adjustment to a partnership item of First Ship is no less of an adjustment to a partnership item of First Ship simply because it was triggered by an adjustment to a partnership item of a partnership in which First Ship held an interest. That seems fairly straightforward to me. And so, and really, and again, that's the only issue, because the taxpayers do not dispute that if these consent agreements were to be produced effective to hold open the period of assessment of any resulting additional tax from the disallowance of this loss, if these consent agreements were effective to hold that period open until June 30th, 2008, the taxpayers do not dispute that the issuance of the FPOD of 2000A on June 19th, 2008, suspended that period for the duration of this litigation and for a period of one year thereafter, and that's under Section 6229D of the Code. So the only issue is whether these consent agreements held open that period for assessing the tax, any additional tax that may result from the disallowance of this loss. Alito, did you agree with the appellants that we're talking about the plain language of the consent agreement? Yes. Neither side is arguing that that language is ambiguous. That is correct. And I will say, though, that although the taxpayers make the plain language argument, they do sort of refer to extraneous circumstances. Well, the IRS issued this other form but never followed up on it. That's irrelevant if we're talking about a plain language argument. And so, yeah, they have not argued that this language is ambiguous, and we don't think it is either. And another thing, you know, okay, we're talking about what is the plain meaning of adjustment to partnership flow-through items of first ship. Something we explained in our brief is that the principle of expressio unius does not apply here because it might apply if the general language of the form referred to adjustments to all partnership items. It doesn't. If it did, then you might possibly infer that the restrictive language necessarily excludes adjustments to partnership items of first ship that are attributable to adjustments to another partnership. But again, the general language of the form does not refer to adjustments to partnership items. It refers to tax attributable to all partnership items. And I think it's fairly clear that tax can be attributable to an adjustment to a partnership item of an upper-tier partnership and also be attributable to an adjustment to a partnership item of a lower-tier partnership. I mean, even the Russian recovery court recognized that much when it was discussing Mrs. Zimmerman's situation. So, again, I think that, and while we're on the subject of Russian recovery, let me add a couple of observations about that case, a couple of additional distinctions. The form in that case was a different form than the one involved here, and that was Form 872P. And Form 872P, in, you know, as part of the preprinted language, had language to the effect that if the IRS issues an FPA to the above-name partnership, then the period of assessment will be suspended. And so arguably, that, you know, that could be read as supporting the Court's The reference in that agreement to partnership items of the above-name partnership was limited to partnership items of the above-name partnership that the IRS could adjust without having to issue an FPA to a lower-tier partnership. Another distinction is, again, that this language was part of the preprinted language of that form, the 872P, in the Russian recovery case. And one thing the Court said is courts have also considered that an ambiguity in an agreement between the taxpayer and the IRS is resolved against the latter as drafter of the agreement. So that principle about, you know, construing ambiguities against the IRS is not applicable here for two reasons. One, this, we don't, this was added language. The language at issue in our case was added. It wasn't part of the preprinted form. And, again, neither party argues that the other one is. Alitoson is claiming that it's an ambiguity. Exactly. Right. And just, you know, for that matter, if the taxpayers sort of imply that this language originated with the IRS and that the IRS took an active role in drafting it, and I think, you know, if you want to get into, if you want to get into the extraneous circumstances, I think you'll find that the exact opposite is true. Thank you, counsel. Just briefly, to pick up on Judge Bennett's question, we are certainly not arguing that you need to go beyond the plain language of this contract. The analysis in this case is very straightforward. If you want a tolling agreement to apply to an entity, you must name the entity in the tolling agreement. Full stop. The only reason we go beyond that is we're responding to arguments made by the government and trying to put for the Court the context of this particular agreement, or put this particular agreement into context. And I think it's important to go back and respond to several of the points that the government was making on brief and also in argument to the context in which these of 2004. This was the very beginning of an audit, and at the time, just like any other party that's looking to what its claims might be and not knowing what they are because they haven't even started discovery in a matter, you cover the universe. If there are two entities that you know were involved in a transaction, you name both of them in your tolling agreement. This is not some multi-tier hedge fund with hundreds of partnerships underneath.  The IRS knew very well that there were two entities. So I take it your position is let's assume hypothetically the situation had been reversed. That is, that the tolling agreement was executed by 2000A and not FirstShip. I gather your position would be the same as it is today, that you needed both notice to both to effectuate the result that the government wants or not. That's correct. And of course, the IRS issued an FPA to 2000-A. So had they secured that tolling agreement, we wouldn't be here. But if, again, it was reversed and they secured that tolling agreement for 2000-A, but then only pursued an FPA against FirstShip, we would be here because presumably the government would have some other argument as to how it all doesn't matter and all kind of bounces off one partnership and this theory that they've got. So if that's true, why do you assert that it would make a difference if we had hundreds of partnerships as opposed to two? It would. I think if you have two. So in your view, let's say if we've got a hundred partnerships in the lower tier, you still need to give notice to everybody. Is that your position? I think if you have a number of different partnerships in a tier, then you need to either name the partnerships that you ultimately want to pursue, or what the IRS typically does is it starts with an 872P, which covers the partnership, or it gets the basic Form 872I. And if you look at just the 872I, which is excerpts of record pages 140 and 141, the standard 872I covers every single partnership interest a partner may have, named, unnamed, disclosed, undisclosed. So if the IRS doesn't know where its audit might lead, then it won't do a restricted consent. It will get just the 872I, and that will automatically cover everything underneath, any partnership interest that partner may have. It didn't do that here and was willing to go and not do that here because it knew the two entities involved. It knew it was First Ship, and it knew it was 2000-A. So it knew in 2004 that all it needed to do was to get a tolling agreement that covered First Ship and get a tolling agreement that covered 2000-A. More than four years later, having secured only one of those, and having asked for but never secured the tolling agreement for 2000-A, it makes audit adjustments to what are indisputably partnership items of the entity not named in its tolling agreement. That's the disconnect that we have here. Now, why that happened, as the government says, is irrelevant. We argue plain language. They argue plain language. You don't need to go beyond, with a little context that I've just given the Court, you don't need to go beyond the fact that they have a tolling agreement that says First Ship and an audit adjustment that says 2000-A. It doesn't work. Why that happened? I don't have the language in front of me, but I assume that the language tendered to 2000-A partnership was the same as this? It was not. And is that part of the record? It is part of the record. The excerpt of record 118 to 119 is the letter requesting the 872P. I'll take a look. And that's simply that that covers the partnership. And when IRS secures those agreements, it doesn't matter who the partners are. That's a partnership-specific tolling agreement. So if it knows a partnership, that's what it typically does. So this language we're talking about here, the 872I restricted consent language, is not in that 872P. That was unique to First Ship and, again, only names First Ship. So just to summarize, our point is always the same. It's plain language. Contract says First Ship. Audit adjustment. The theories that the government pursued in 2008, more than four years later, were not First Ship theories. They were 2000SA theories. It doesn't connect. Mr. Desmond, what's your take on the government's claim that part of Russian Recovery Fund was wrongly decided? Well, I certainly disagree with that. I think Russian Recovery Fund was rightly decided. It does involve an 872P. So what Russian Recovery Fund looks at, it's a tiered partnership structure, much more complicated than one that we have here, where the IRS actually secured a tolling agreement from one entity, but made adjustments to another entity. So, and the court in Russian Recovery Fund, the Court of Federal Claims, rejected the IRS's argument that somehow because it bounces off the upper tier partnership, it's covered by that 872P for the upper tier partnership. So that was correctly decided. It is distinguishable, as the government said, because of the 872P, so it covers all partnership items. But I think it's correct in just a basic matter of contract interpretation. It says one partnership, and the adjustments were made to another partnership. So on that basis, it was correctly decided, and is analogous to the facts that we have here. You want a contract to cover an entity, you got to name the entity. Any further questions? Thanks for your argument. Interesting case. The case will be submitted for decision. Thank you all for your presentations.
judges: Bennett, Thomas, McKeown